IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>JUSTIN DAVIS,<br><br>　　　　Defendant. | No. CR12-0095<br><br>REPORT AND<br>RECOMMENDATION |

TABLE OF CONTENTS

I.   INTRODUCTION ............................................. 1

II.  PROCEDURAL HISTORY ................................... 2

III. RELEVANT FACTS ......................................... 2

IV.  ISSUES PRESENTED ....................................... 5

V.   DISCUSSION ................................................ 6
     A.   Was the Dog Sniff an Unlawful Warrantless Search? ........... 6
     B.   If Evidence of the Dog Sniff is Omitted, is the Search
          Warrant Supported by Probable Cause? ..................... 9
     C.   If the Search Warrant is Invalid, Does the Leon Exception
          to the Exclusionary Rule Apply? ......................... 11

VI.  RECOMMENDATION ...................................... 13

I. INTRODUCTION

On the 29th day of January 2013, this matter came on for hearing on the Motion to Suppress (docket number 16) filed by the Defendant on January 16, 2013. The Government was represented by Assistant United States Attorney Patrick J. Reinert. The

Defendant, Justin Davis, appeared personally and was represented by his attorney, Jane Kelly.

## II. PROCEDURAL HISTORY

On December 19, 2012, Defendant Justin Davis was charged by indictment with possession of marijuana with intent to distribute, after having been previously convicted of a felony drug offense. At his arraignment, Defendant entered a plea of not guilty and trial was scheduled before Chief Judge Linda R. Reade on February 19, 2013.

On January 16, 2013, Defendant timely filed the instant motion to suppress. The Government filed a resistance on January 18, 2013. Because of the pending motion, the trial has been continued to March 18, 2013, with a status conference set on February 20, 2013.

## III. RELEVANT FACTS

Defendant is on state court probation. During the late afternoon of December 12, 2012, Officer Steve Warner was conducting surveillance on a vehicle known to be used by Defendant. Warner is an officer with the high risk unit of the Sixth Judicial District Department of Correctional Services. As part of his duties, Warner is asked to conduct "field work" on behalf of other probation officers. Until recently, he was assigned to the DEA drug task force. In that role, he conducted federal narcotics investigations.

In the summer of 2012, Defendant's probation officer asked Officer Warner to conduct home visits at Defendant's residence. On the first visit, Warner was told by Defendant's wife that he was in the garage. Warner then went to the garage and found two "corner baggies," which Warner testified are consistent with drug trafficking. Warner conceded, however, that he did not see any controlled substances in the corner baggies. Warner conducted two additional home visits later in the summer and did not find any contraband.

On December 12, 2012, Officer Warner received information from Cedar Rapids police officers that a vehicle associated with Defendant was at the Cambridge apartment

complex. Warner proceeded to the area at around 5:00 p.m. and located a black Riviera used by Defendant. Warner did not see anybody around and did not know where Defendant was located. Warner, who was driving an unmarked vehicle, decided to pull into a parking lot across the street and conduct surveillance.

At 5:15 p.m., Officer Warner observed a white male approach apartment number 5, knock, enter the residence, and leave in less than one minute. At 5:35 p.m., Warner observed a black male approach apartment number 5, knock, enter the residence, and leave in less than one minute. At 5:40 p.m., Warner observed a red car pull up next to Defendant's Riviera. Defendant came out of apartment number 5, approached the passenger side of the red car, and after several minutes returned to apartment number 5. Warner testified he could not see what was happening on the passenger side of the car from his vantage point. Because his suspicions were aroused by this activity, Warner called for assistance.

At approximately 6:00 p.m., Officer Warner observed a black female arrive in an SUV and enter apartment number 5, without coming out. Shortly after that time, Warner observed a white male approach apartment number 5, knock, enter the residence, and then leave after approximately three minutes. Warner attempted to determine the vehicle in which the white male left the scene, and other officers subsequently conducted a vehicle stop, but it is unclear whether the vehicle stopped was the vehicle associated with the person who had entered the apartment.

Officer Warner then called for a drug detection dog. Officer Jeff Gilson of the Marion Police Department testified that he responded to Warner's request for assistance. Gilson and his dog, Bruno, are certified in the detection of controlled substances, and have been teamed for approximately three years. Gilson believes that he arrived at the scene at approximately 7:30 p.m. While waiting for Gilson to arrive, Warner observed a white female approaching the building. Defendant came out of the apartment, approached the

3

woman, and then escorted her back into the apartment. She left the apartment less than one minute later.

It is necessary to pause and describe the apartment which is the subject of the search warrant. Both parties provided photographs displaying the scene.[1] The two-story building contains multiple apartments. There are four exterior doors on the east side of the building — numbered 1, 3, 5, and 7 — leading directly into four apartments. The doors to apartments 5 and 7 are adjacent to one another, and separated by approximately 18 inches. There are two mailboxes located in the area between the two doors. A sidewalk serving apartments 5 and 7 extends from the parking area to the doorways. While the record is somewhat imprecise, the distance from the parking area to the doorways appears to be approximately 1-1/2 car lengths. The common sidewalk widens as it nears the building, extending to each side of the doorways.

At Officer Warner's request, Officer Gilson — who was wearing street clothes — walked Bruno from the south end of the building to the north end. As they passed each doorway, Gilson directed Bruno to sniff at the door. According to Gilson, "we only sniff doors." Bruno did not alert or show any change of behavior at the doorways of apartments 1 and 3. When sniffing the door of apartment number 5, Bruno showed no change of behavior at the bottom left of the door, but sniffed deeply, "snorted," and "stood in a locked position" after sniffing the bottom right corner. Bruno then moved over to the door of apartment number 7, but immediately returned to apartment number 5. Once again, Bruno took a deep breath, snorted it out, and stayed in a "frozen position."

At that time, the door to apartment number 5 opened and Defendant asked Officer Gilson "what are you doing?" At that point, Bruno attempted to enter the apartment. Gilson restrained Bruno with his leash, and Bruno then sat down, which is his trained behavior for the detection of a controlled substance. Defendant closed the door and Gilson walked on to the north end of the building.

---

[1] *See* Government's Exhibit 2 and Defendant's Exhibits A-F.

Officer Warner was concerned that Defendant may have suspected that the dog sniffing at his door was a police dog. Accordingly, Warner and two uniformed Cedar Rapids police officers approached apartment number 5 and knocked. The black female who had arrived earlier (and was later identified as Erica Lewis) opened the door. Warner could see Defendant sitting on the couch. Warner told Lewis that he needed to speak to Defendant, and entered the apartment without seeking or receiving Lewis' permission. When a security check was made of the apartment, a scale and remnants of a green leafy substance were observed on the kitchen table. Warner conceded that he could not smell any marijuana. The apartment was then secured, and Warner left to obtain a search warrant.

A copy of the search warrant application, supporting affidavit, the judicial officer's endorsement, and the search warrant were introduced as Government's Exhibit 1. Officer Warner's affidavit describes the suspicious comings-and-goings which occurred at apartment number 5 between approximately 5:15 and 7:23 p.m., and also describes the dog sniff conducted by Officer Gilson and Bruno. Warner advised the magistrate in his affidavit that he entered the apartment at approximately 7:52 p.m. and conducted a "walk through" for officer safety. Warner does *not* tell the magistrate that a scale and the residue of a green leafy substance were seen on the kitchen table. The judicial officer found probable cause and issued a search warrant for the apartment.[2] A search of the apartment revealed marijuana in the refrigerator and in a woman's coat pocket.

## IV. ISSUES PRESENTED

There are three issues raised by the motion to suppress and the resistance. First, Defendant argues that the dog sniff outside his front door was a warrantless search and violated the Fourth Amendment. Second, Defendant asserts that if evidence obtained from the dog sniff is omitted from the search warrant application, then it fails to state probable cause and the search warrant is invalid. The Government denies Defendant's claims, and

---

[2] The Court is unable to determine the name of the judicial officer from Exhibit 1.

raises a third issue. That is, the Government argues that even if the search warrant is otherwise invalid, the exclusionary rule is inapplicable because of the good-faith exception found in *United States v. Leon*, 468 U.S. 897 (1984).

## V. DISCUSSION

### A. Was the Dog Sniff an Unlawful Warrantless Search?

Defendant first argues that "the use of a drug detection dog to sniff at the front door of a private residence is a search that, without a warrant, is constitutionally impermissible."[3] Courts have repeatedly held that because a well-trained narcotics-detection dog discloses only the presence or absence of contraband, it does not implicate the Fourth Amendment. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 408 (2005) ("Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."); *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997) (because there is no reasonable expectation of privacy in a hotel hallway, there can be no Fourth Amendment violation). Defendant urges a different result, however, when a drug detection dog is deployed at the door to his apartment.

In support of his argument, Defendant cites *Jardines v. State*, 73 So.3d 34 (Fla. 2011). There, officers received an unverified "crime stoppers" tip that the home of Joelis Jardines was being used to grow marijuana. One month later, acting on the tip and other information, two detectives approached the residence, accompanied by a drug detection dog. After the dog alerted to the scent of contraband, officers sought and obtained a search warrant for the home. The defendant filed a motion to suppress, arguing the dog sniff was an unconstitutional warrantless search.

After thoroughly reviewing the United States Supreme Court cases addressing dog sniffs,[4] the Florida Supreme Court concluded that the "sniff test" conducted at Jardines'

---

[3] Defendant's Brief (docket number 16-1) at 3.

[4] *See United States v. Place*, 462 U.S. 696 (1983); *City of Indianapolis v. Edmond*,
(continued...)

residence constituted a substantial government intrusion into the sanctity of the home and constituted a "search" within the meaning of the Fourth Amendment.

> [A] "sniff test" by a drug detection dog conducted at a private residence does not *only* reveal the presence of contraband, as was the case in the federal "sui generis" dog sniff cases discussed above, but it also constitutes an intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment, and it raises the specter of arbitrary and discriminatory application.

*Jardines*, 73 So.3d at 49. The United States Supreme Court accepted *certiorari* in *Jardines*, and the case was argued on October 31, 2012.

Eighth Circuit precedent holds, however, that a dog sniff at the entry to a private residence does not violate the Fourth Amendment. In *United States v. Scott*, 610 F.3d 1009 (8th Cir. 2010), a confidential informant told law enforcement that Scott was distributing crack cocaine out of his apartment. An officer took his drug detection dog into the common hallway of the apartment building, and the dog sniffed at the door of Scott's apartment. Based on the dog's alert, officers applied for and obtained a search warrant. The defendant filed a motion to suppress, arguing that "the use of a drug detection dog to sniff the doorframe of his apartment violated the Fourth Amendment." *Id.* at 1013. The Eighth Circuit rejected the defendant's argument, stating "Supreme Court and Eighth Circuit precedent support the conclusion that Naton's sniff of the apartment door frame from a common hallway did not constitute a search subject to the Fourth Amendment." *Id.* at 1016. The Court specifically rejected the defendant's argument that the Court should extend the holding in *Kyllo v. United States*, 533 U.S. 27 (2001),[5] to encompass dog sniffs.

---

[4](...continued)
531 U.S. 32 (2000); *Illinois v. Caballes*, 543 U.S. 405 (2005).

[5] In *Kyllo* the Court held that the use of a thermal imaging device constituted an unlawful warrantless search.

Defendant argues that *Scott* is distinguishable from the facts of this case because each apartment here has a doorway "directly to the outside" and the officer "approached a private entry into a single family residence, rather than a common entry or hallway."[6] First, the Court notes that this was not a "single family residence." Rather, it was an apartment building, like the building in *Scott*, except the doorways to the apartments were to the outside, rather than an interior hallway. Second, the Court notes that the sidewalk leading to apartment number 5 did not serve that apartment only. The occupants of apartment numbers 5 and 7 shared a common sidewalk. Furthermore, the sidewalk was apparently used by the mailman; and could be used by Girl Scouts selling cookies or any other persons intending to approach the apartments. That is, while Defendant argues that the dog sniff was an unlawful warrantless search, he does not argue that Officer Gilson and Bruno were unlawfully at the location where the dog sniff occurred.[7]

I believe the result in this case is governed by the Court's ruling in *Scott*. In both cases, a dog sniff was conducted at the entryway of an apartment, from a location where the officer and the dog were legally entitled to be. While the doorway in *Scott* led to a common hallway and the doorway here led to a common sidewalk, I believe that is a distinction without legal significance. We will learn shortly whether the United States Supreme Court will adopt the "public opprobrium" argument found in *Jardines*.[8] Defendant concedes, however, that this Court is governed by existing precedent of the United States Supreme Court and the Eighth Circuit Court of Appeals, and *Jardines* has

---

[6] Defendant's Brief (docket number 16-1) at 3.

[7] The fact that Officer Gilson and Bruno cut across the grass, rather than walking up the sidewalk, to approach Defendant's front door is not legally significant.

[8] The Court in *Jardines* was principally concerned that a dog sniff at a private residence constitutes "an intrusive procedure that may expose the resident to public opprobrium, humiliation and embarrassment." Here, the dog sniff was conducted by an officer in plain clothes and, with the exception of Defendant, may have gone unnoticed by others.

8

no precedential value here. Because the facts in this case do not differ significantly from those in *Scott*, the Court believes that Defendant's first argument must fail.

### B. If Evidence of the Dog Sniff is Omitted, is the Search Warrant Supported by Probable Cause?

Next, Defendant argues that if references to the dog sniff are omitted from the search warrant application, then the remaining information would not support a finding of probable cause. As set forth above, I believe the dog sniff did not constitute a warrantless search and, therefore, did not violate the Fourth Amendment. Accordingly, it is not necessary to consider whether the remaining information in the search warrant application supports a finding of probable cause.[9] I will address the second issue, however, in the event the district court disagrees with my conclusion on the first issue.

In support of his search warrant application, Officer Warner attached an "Affiant's Statement," consisting of four numbered paragraphs. The first paragraph states that Defendant's vehicle had been seen at the Cambridge apartment complex, while the fourth paragraph describes Warner's entry into the apartment. Both paragraphs provide general information regarding the underlying circumstances, but do not state any incriminating facts to establish probable cause. The third numbered paragraph describes the dog sniff.

The second numbered paragraph describes the suspicious activity observed by Officer Warner. *If* the third paragraph is omitted from the affidavit, the judicial officer was advised of the following:

1. At approximately 5:15 p.m., Warner observed a white male approach apartment number 5, knock, enter the residence, and exit approximately one minute later.

2. At 5:35 p.m., Warner observed a black male knock on apartment number 5, go inside, and then leave the apartment approximately one minute later.

---

[9] Defendant concedes that if evidence of the dog sniff is considered, then the search warrant application supports a finding of probable cause.

9

3. At 5:40 p.m., a red vehicle parked next to the black Riviera associated with Defendant. Defendant exited apartment number 5, approached the red car on the passenger side, and it appeared a conversation took place between Defendant and the occupants of the vehicle. Approximately nine minutes later, the vehicle drove away and Defendant returned to his apartment.

4. At approximately 6:05 p.m., a white male approached apartment number 5, knocked, entered the apartment, and then exited approximately three minutes later.

5. At approximately 7:22 p.m., Warner saw a white female approach the apartment, where she was met outside by Defendant. Both individuals went inside, with the female exiting the apartment approximately one minute later.

6. Based on Warner's training and experience, the activities described above are "indicitive [sic] of drug trafficking."

Simply put, the issue is whether frequent short-term visits of the type described in the affidavit support a finding that there is probable cause to believe evidence of criminal wrongdoing could be found in the apartment.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe that there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Rodriguez*, 414 F.3d 837, 843 (8th Cir. 2005). In determining whether probable cause exists, the Court recognizes that officers possess specialized law enforcement experience and thus may "draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous." *United States v. Mendoza*, 421 F.3d 663, 667 (8th Cir. 2005) (quoting *United States v. Caves*, 890 F.2d 87, 94 (8th Cir. 1989)). Probable cause "is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 577 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1984)).

Here, the Government argues probable cause is established by Officer Warner's observations that, within a two-hour period of time, four persons entered and left the apartment within a minute or two, and a vehicle pulled up briefly to the parking area. The parties have not cited any cases where probable cause is based solely on suspicious comings-and-goings, and the Court has found none. Presumably, if only one person had been observed entering and then leaving the apartment in less than one minute, probable cause would not exist. On the other hand, if ten persons had been seen entering the apartment and then leaving almost immediately over a two-hour period, then based on the specialized knowledge of a narcotics officer, one could conclude that there was a "fair probability" that contraband could be found in the apartment. So, the question becomes whether four persons entering the apartment and leaving within a minute or two, coupled with a "drive up," where Defendant exited the apartment and met with the occupants of the vehicle, could support a finding by a reasonable person that there is a fair probability that contraband would be found in the apartment. *Rodriguez*, 414 F.3d at 843.

I believe this is a close question. The Court is reminded, however, that as the term suggests, "probable cause" deals with probabilities. In determining whether it is probable that contraband would be found in apartment number 5, the judicial officer was entitled to rely on the specialized knowledge possessed by Officer Warner, and draw reasonable inferences of criminal activity based on that expertise. While the issue is not without doubt, I believe that even *if* evidence regarding the dog sniff was removed from the application, it would nonetheless support a finding of probable cause. For the reasons set forth above and below, however, I do not believe it is necessary for the district court to definitively resolve that issue.

### C. *If the Search Warrant is Invalid, Does the Leon Exception to the Exclusionary Rule Apply?*

For the reasons set forth above, I believe the search warrant in this case was valid. *If* the district court concludes the dog sniff was an unlawful warrantless search, however,

11

and *if* the warrant lacked probable cause when evidence regarding the dog sniff is omitted from the search warrant application, then the exclusionary rule is *still* inapplicable.[10]

The Constitution does not expressly prohibit the introduction of evidence obtained in violation of the Fourth Amendment. *United States v. Leon*, 468 U.S. 897, 906 (1984). Rather, the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The Court noted in *Leon* that it "frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Id.* at 918. After reviewing the purposes of the exclusionary rule, the Court concluded that "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant" will not be suppressed. *Id.* at 922. An officer's reliance on a search warrant is not "objectively reasonable," however, if one of four circumstances is present:

> The Supreme Court has identified four circumstances in which an officer's reliance on a search warrant would be objectively unreasonable: (1) when the affidavit or testimony in support of the warrant included a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) when the warrant is "so facially deficient" that the executing officer could not reasonably presume the warrant to be valid.

---

[10] The validity of the search warrant and the good-faith exception may be addressed by the district court in either order. That is, if the *Leon* good-faith exception is applicable, then the Court need not address the validity of the warrant. *United States v. Pruett*, 501 F.3d 976, 979 (8th Cir. 2007).

*United States v. Grant*, 490 F.3d at 627, 632-33 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923).

Even if the search warrant in this action is found to be invalid, I believe the officers executed the search warrant in good faith. None of the circumstances described in *Grant* are present here. That is, (1) the application did not include any false statements, (2) there is no indication the issuing judge wholly abandoned his or her judicial role, (3) the affidavit was not "so lacking" in probable cause as to render reliance on the warrant "entirely unreasonable," and (4) there is no claim of a facial deficiency on the warrant.

The Eighth Circuit Court of Appeals has applied the *Leon* good-faith exception, even where the search warrant application cites information gathered in violation of the Fourth Amendment. *United States v. Cannon*, 2013 WL 68890 at *4 (C.A. 8 (Ark.)) (citing *United States v. Kiser*, 948 F.2d 418, 421 (8th Cir. 1991)). Even if the United States Supreme Court finds that a dog sniff at the entry of a private residence constitutes an unlawful warrantless search, it cannot be said that Officer Warner acted in bad faith by including the evidence in the application, that the judicial officer wholly abandoned his or her role in finding probable cause, or that the officer's reliance on the warrant was entirely unreasonable. Accordingly, even *if* the search warrant is otherwise invalid, the exclusionary rule does not prevent the Government from offering evidence found during the search.

## VI. RECOMMENDATION

For the reasons set forth above, it is respectfully **RECOMMENDED** that the Motion to Suppress (docket number 16) filed by the Defendant be **DENIED**. The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections."*

*Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on January 29, 2013.*

DATED this 5th day of February, 2013.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA